UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

| | | |
|---|---|---|
| JONATHAN BARRY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No.  5:21-cv-01457-HNJ |
| | ) | |
| COMMISSIONER, SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

Plaintiff Jonathan Barry seeks judicial review pursuant to 42 U.S.C. § 405(g) of an adverse, final decision of the Commissioner of the Social Security Administration ("Commissioner"), regarding his claim for a period of disability and disability insurance benefits.  (Doc. 1).  The undersigned carefully considered the record, and for the reasons expressed herein, **AFFIRMS** the Commissioner's decision.[1]

## LAW AND STANDARD OF REVIEW

To qualify for benefits, the claimant must be disabled as defined by the Social Security Act and the Regulations promulgated thereunder.  The Regulations define "disabled" as the "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result

---

[1] In accordance with the provisions of 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties have voluntarily consented to have a United States Magistrate Judge conduct any and all proceedings, including the entry of final judgment.  (Doc. 11).

in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a). To establish an entitlement to disability benefits, a claimant must provide evidence of a "physical or mental impairment" which "results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

In determining whether a claimant suffers a disability, the Commissioner, through an Administrative Law Judge ("ALJ"), works through a five-step sequential evaluation process. *See* 20 C.F.R. § 404.1520(a)(4). The burden rests upon the claimant at the first four steps of this five-step process; the Commissioner sustains the burden at step five, if the evaluation proceeds that far. *Washington v. Comm'r of Soc. Sec.*, 906 F.3d 1353, 1359 (11th Cir. 2018).

In the first step, the claimant cannot be currently engaged in substantial gainful activity. 20 C.F.R. § 404.1520(b). Second, the claimant must prove the impairment is "severe" in that it "significantly limits [the] physical or mental ability to do basic work activities . . . ." *Id.* at § 404.1520(c).

At step three, the evaluator must conclude the claimant is disabled if the impairments meet or medically equal one of the impairments listed at 20 C.F.R. Part 404, Subpart P, App. 1, §§ 1.00-114.02. *Id.* at § 404.1520(d). If a claimant's impairment meets the applicable criteria at this step, that claimant's impairment would prevent any person from performing substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(iii),

404.1525.  That is, a claimant who satisfies steps one and two qualifies automatically for disability benefits if the claimant suffers a listed impairment.  *See Williams v. Astrue,* 416 F. App'x 861, 862 (11ᵗʰ Cir. 2011) ("If, at the third step, [the claimant] proves that [an] impairment or combination of impairments meets or equals a listed impairment, [the claimant] is automatically found disabled regardless of age, education, or work experience." (citing 20 C.F.R. §§ 404.1520, 416.920; *Crayton v. Callahan*, 120 F.3d 1217, 1219 (11ᵗʰ Cir. 1997))).

If the claimant's impairment or combination of impairments does not meet or medically equal a listed impairment, the evaluation proceeds to the fourth step, where the claimant demonstrates an incapacity to meet the physical and mental demands of past relevant work.  20 C.F.R. § 404.1520(e).  At this step, the evaluator must determine whether the claimant has the residual functional capacity ("RFC") to perform the requirements of past relevant work.  *See id.* § 404.1520(a)(4)(iv).  If the claimant's impairment or combination of impairments does not prevent performance of past relevant work, the evaluator will determine the claimant is not disabled.  *See id.*

If the claimant succeeds at the preceding step, the fifth step shifts the burden to the Commissioner to provide evidence, considering the claimant's RFC, age, education and past work experience, that the claimant is capable of performing other work.  20 C.F.R. §§ 404.1512(b)(3), 404.1520(g).  If the claimant can perform other work, the evaluator will not find the claimant disabled. *See id.* § 404.1520(a)(4)(v); *see also* 20 C.F.R.

§ 404.1520(g).  If the claimant cannot perform other work, the evaluator will find the claimant disabled.  20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(g).

The court must determine whether substantial evidence supports the Commissioner's decision and whether the Commissioner applied the proper legal standards. *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011).  The court reviews the ALJ's "'decision with deference to the factual findings and close scrutiny of the legal conclusions.'" *Parks ex rel. D.P. v. Comm'r, Social Sec. Admin.*, 783 F.3d 847, 850 (11th Cir. 2015) (quoting *Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991)). Indeed, "an ALJ's factual findings . . . 'shall be conclusive' if supported by 'substantial evidence.'" *Biestek v. Berryhill*, 139 S. Ct. 1148, 1153 (2019) (citing 42 U.S.C. § 405(g)). Although the court must "scrutinize the record as a whole . . . to determine if the decision reached is reasonable . . . and supported by substantial evidence," *Bloodsworth v. Heckler,* 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted), the court "may not decide the facts anew, reweigh the evidence, or substitute [its] judgment" for that of the ALJ.  "[W]hatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high. . . .  Substantial evidence . . . . is 'more than a mere scintilla,' . . . [and] means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek*, 139 S. Ct. at 1154 (citations omitted). Therefore, substantial evidence exists even if the evidence preponderates against the Commissioner's decision. *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005).

## FACTUAL AND PROCEDURAL HISTORY

Barry, age 44 at the time of the ALJ's decision, protectively filed an application for disability insurance benefits on January 22, 2020, alleging disability beginning August 12, 2019. (Tr. 19, 186). The Commissioner denied Barry's claims initially and upon reconsideration, and Barry timely filed a request for a hearing on August 14, 2020. (Tr. 73-98, 105-18). The ALJ held a hearing on April 22, 2021 (Tr. 40-70), and she issued an opinion on May 11, 2021, denying Barry's claims. (Tr. 19-35).

Applying the five-step sequential process, the ALJ found at step one that Barry did not engage in substantial gainful activity after August 12, 2019, his alleged onset date. (Tr. 24). At step two, the ALJ found Barry exhibited the severe impairments of "lumbar degenerative disk disease and degenerative joint disease status post L4-5 fusion (August 2019) and L4-5 decompressive laminectomy with hardware removal (February 2020)." (Tr. 25). At step three, the ALJ found that Barry's impairments, or combination of impairments, did not meet or medically equal any impairment for presumptive disability listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 26).

Next, the ALJ found that Barry exhibited the RFC

to perform sedentary work as defined in the Regulations except: occasional postural maneuvers; no climbing o[f] ropes, ladders, or scaffolds; avoid concentrated exposure to vibration; avoid operating dangerous unguarded machinery and unprotected heights; and he must be afforded the option to sit and stand during the workday, for one to two minutes at a time while remaining on task.

(Tr. 27-28).

At step four, the ALJ determined Barry could not perform his past relevant work as a construction foreman/superintendent, stock clerk, materials handler, lubricator, or exterminator. (Tr. 33). However, at step five, the ALJ determined Barry could perform a significant number of other jobs in the national economy considering his age, education, work experience, and RFC. (*Id.*). Accordingly, the ALJ determined Barry has not suffered a disability, as defined by the Social Security Act, since August 12, 2019. (Tr. 34).

Barry timely requested review of the ALJ's decision. (Tr. 179-82). On September 2, 2021, the Appeals Council denied review, which deems the ALJ's decision as the Commissioner's final decision. (Tr. 1-3). On October 31, 2021, Barry filed his complaint with the court seeking review of the ALJ's decision. (Doc. 1).

## ANALYSIS

In this appeal, Barry argues the ALJ failed to properly evaluate his subjective symptoms and their effect on his ability to work. For the reasons discussed below, the undersigned concludes Barry's contention does not warrant reversal.

> A three-part "pain standard" applies when a claimant attempts to establish disability through her own testimony of pain or other subjective symptoms. [*Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002) (per curiam)]. The pain standard requires evidence of an underlying medical condition and either objective medical evidence that confirms the severity of the alleged pain arising from the condition or a showing that the objectively determined medical condition is of such severity that it can be reasonably expected to give rise to the alleged pain. *Id.*

*Porto v. Acting Comm'r of Soc. Sec. Admin.*, 851 F. App'x 142, 148 (11th Cir. 2021) (per

curiam).  A claimant's testimony coupled with evidence that meets the pain standard "is itself sufficient to support a finding of disability."  *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991) (citations omitted).

Social Security Ruling ("SSR") 16-3p, effective March 28, 2016, and republished October 25, 2017, eliminates the use of the term "credibility" as it relates to assessing the claimant's complaints of pain and clarifies that the ALJ "will consider any personal observations of the individual in terms of how consistent those observations are with the individual's statements about his or her symptoms as well as with all of the evidence in the file."  SSR 16-3p, 2017 WL 5180304, *7 (Oct. 25, 2017).  An ALJ rendering findings regarding a claimant's subjective symptoms may consider a variety of factors, including: the claimant's daily activities; symptom location, duration, frequency, and intensity; precipitating and aggravating factors; type, dosage, effectiveness, and side effects of medication taken to alleviate the symptoms; and other factors concerning functional limitations and restrictions due to symptoms.  *See* 20 C.F.R. § 404.1529(c)(3), (4).

SSR 16-3p further explains that the ALJ's decision "must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent review can assess how the adjudicator evaluated the individual's symptoms."  2017 WL 5180304, at *9; *see also Wilson*, 284 F.3d at 1225 (If an ALJ discredits a claimant's subjective testimony, the ALJ "must articulate explicit and adequate reasons for doing so.").

7

During the administrative hearing, Barry testified he experiences pain and weakness in his back.  He helps his wife prepare their grandchildren for school, drives the oldest grandchild to school, then returns home to watch television.  He alternates between sitting, lying down, and walking around the house to alleviate his pain.  He sometimes drives around his town or walks in his yard, but he walks with a cane, which no doctor prescribed, because he does not know when his right knee may lock up.  On a good day, he can walk approximately 30 to 45 minutes before needing to rest, but on a bad day, he can walk only approximately 15 to 20 minutes.  When he pushes himself towards increased activity one day, he usually struggles with increased pain the following day.  When sitting, he feels pain in the back and top of his leg.  He lies down approximately three to four hours each day.

He does not perform any yard work other than picking up sticks with a hand-held mechanical grabber.  However, he can fold clothes and load a dishwasher.  When he bends over, he feels pain across his lower back down into his right hip, and from the bottom to middle of his back all the way to the front of his chest.  His medications sometimes make him feel tired, but he otherwise does not experience any medication side effects.  He can care for his own personal needs, but his wife typically performs the household shopping.  He and his wife sometimes take the grandchildren to a park, but he can only play outside with his grandchildren for a very limited amount of time.  An implanted stimulator helped alleviate the pain in his lower back and legs, but it did not alleviate the mid-back pain.  (Tr. 56-63).

In a February 21, 2020, Function Report, Barry stated he typically helps prepare the grandchildren for school, then lies on a bed to watch television or uses the computer to pay bills until the family returns home at 4:30 p.m., unless he needs to drive into town. After the family returns home, he helps make dinner, performs housework tasks, prepares the grandchildren for bed, and feeds his dogs before going to bed. He also sometimes takes the dogs for a walk.

His pain wakes him up at night and causes difficulty falling back asleep. He has no problems with personal care. He prepares meals for approximately 15 to 20 minutes daily. He does laundry two to three hours three days a week, and he washes dishes daily for approximately 20 to 30 minutes. He cannot perform any housework or yardwork tasks that require bending, pushing, pulling, or lifting. He goes outside every day, but on the date he completed the form, he did not drive because he underwent surgery only nine days earlier. He shops by computer for clothing and groceries approximately once a week, but he does not shop in stores. He can handle money. His hobbies include reading and watching television. He spends time with in-laws and church friends one to two times each week. He formerly went to parks and recreation centers with his family, but he did not do so at the time he completed his function report.

His conditions affect his ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, and complete tasks. He can lift only five pounds. He can walk a half-mile or more before needing to stop and rest for 30 minutes. He can pay attention as long as needed unless he experiences severe pain, and he finishes tasks he starts. He can

follow written and spoken instructions.   He experiences no problems with authority figures, handles stress very well, and has never lost a job due to relational problems.  He has used a back brace since August 2019, and he used a walker for the first two to three weeks after his surgery.  (Tr. 259-66).

The ALJ found that Barry's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," but she concluded that Barry's "statements concerning the intensity, persistence, and limiting effects" of his impairments were not consistent with the objective medical evidence in the record.  (Tr. 29).

The ALJ adequately articulated a basis for that finding.  She concluded the medical records from both before and after Barry's surgeries did not support a finding of disabling impairments.  Specifically, she considered

> the good findings on objective exams (i.e., orthopedic records absent of significant motor, sensory, or reflex deficits both pre- and post-operatively, no atrophy), results of imaging studies (i.e., solid fusion, widely patent spinal canal free of nerve root/spinal cord compression following decompressive surgery), orthopedic records free of significant motor, sensory, or reflex loss both pre- and post-operatively[], months between visits without ER care required for symptom control, good benefit from treatment, and not following through with therapy for good reason . . . .

(Tr. 32).  She also found the medical record did not contain evidence that Barry experienced significant side effects from his medications or needed an assistive device to ambulate.  She reasoned that Barry had applied for unemployment benefits during 2020, which required a representation that he stands ready, willing, and able to work.

She also considered that none of Barry's physicians permanently restricted his work activities, and that he reported daily activities inconsistent with a complete inability to work. (*Id.*)

Substantial evidence supports the ALJ's findings.

On October 3, 2018, Barry complained to Dr. Coccia, his primary care provider, that he experienced chronic lower back pain, radicular pain in the posterior aspect of the lower extremities, and tingling and numbness in his limbs. He requested a referral to a neurosurgeon. The clinical examination produced tenderness on palpation to the lumbosacral spine, spasms of paraspinal muscles in the lumbosacral spine, negative bilateral straight leg raising tests, no thigh weakness, ability to stand on heels and toes, and normal reflexes. Dr. Coccia administered a steroid shot, prescribed an oral steroid, and referred Barry to Dr. Tao, a neurosurgeon. (Tr. 349-51).

On October 31, 2018, February 18, 2019, November 1, 2019, and May 4, 2020, Barry discussed other conditions with Dr. Coccia, but he did not mention back pain symptoms. (Tr. 328-29, 337-39, 345-48).

Barry first presented to Dr. Seymour at The Orthopedic Center on July 16, 2019. He reported experiencing back discomfort for several years despite multiple epidural injections and physical therapy. The lumbar spine examination revealed

> average muscle development and erect posture. Gait is grossly normal. Spine is without signs of trauma, masses, unusual hair or pigment. No lymphadenopathy is noted. No surgical scars are noted. No deformity is noted of the shoulders, pelvis, knees, ankles, and feet. Normal lordosis is noted. Normal kyphosis is noted. No evidence of lumbar or thoracic

> scoliosis is noted.  Knee heights are level.  No Trendelenburg sign is noted.  No tenderness is noted of the spinous processes, paraspinal region SI joint, PSIS, CVA or trochanter.  Lumbar ROM of lumbar spine includes:  Flexion is 90 degrees, extension is 20 degrees, right and left lateral bending is 30 degrees.  ROM of hips, knees and ankles are normal.  Negative cross and straight leg raise bilaterally.  Patrick's testing is negative.  Femoral stretch testing is negative.  No quad or calf atrophy is noted.  Motor strength is 5/5 bilaterally in the hip flexors, hip adductors, hip abductors, quad, hamstrings, anterior tib, EHL, and gastric-soleus.  Sensation is intact to all dermatones.  Proprioception is intact.  No clonus is noted.  Babinski test is negative bilaterally.  Knee and ankle jerks are 2/4 bilaterally.  No abnormal or femoral bruits are noted.  DP and PT are normal bilaterally.  No lower extremity edema is noted.  No venous varicosities are noted in LE.  No Waddel signs are noted.

(Tr. 397-98).

X-rays revealed disc space height loss at L4-5, which represented a significant increase from supine MRI films, but other disc space heights remained well preserved. Dr. Seymour interpreted an April 6, 2018, MRI as indicating significant degenerative changes at L4-5, loss of hydration at L5-S1, and bilateral foraminal narrowing at L4-5. (Tr. 411-12).  Dr. Seymour assessed lumbar instability and radiculopathy at L4-5.  Due to the failures of more conservative treatment, Dr. Seymour advised that surgery to stabilize the L4-5 joint could improve Barry's symptoms.  (Tr. 397-99).

Dr. Seymour performed anterior and posterior spinal fusions on August 12 and 14, 2019.  (Tr. 402-07, 417-41).  During an August 22, 2019, follow-up, Barry reported he was "doing great."  The physical examination revealed no evidence of symptom amplification, and the surgical site healed well.  Dr. Seymour refilled Barry's pain medications and scheduled a follow-up for four to six weeks thereafter.  (Tr. 395-96).

During a September 4, 2019, well physical, Dr. Coccia noted normal musculoskeletal and neurological findings. (Tr. 340-44).

On September 26, 2019, Barry reported to Dr. Seymour that he was doing "pretty well," though he did experience some numbness in his right buttock. The lumbar spine examination remained unchanged from the previous visit. Dr. Seymour recommended Barry wait to commence physical therapy until he experienced more consolidation from the surgery. (Tr. 393-94).

On November 12, 2019, Barry reported to Dr. Seymour that his pain had significantly decreased, but he still experienced some intermittent stiffness and radiating symptoms into the right leg and left pelvis. The lumbar spine examination findings remained unchanged. A lumbar spine x-ray indicated a well-sealed graft and well-positioned hardware. Dr. Seymour stated Barry could not yet return to work as a pest control technician because he could not lift anything, ride in a car for long distances, or repeatedly enter and exit a vehicle. (Tr. 391-92).

On December 13, 2019, four months after Barry's surgery, he reported to Dr. Seymour's physician's assistant that he experienced right leg pain, with some stumbling, tripping, and falling, yet he did not know what could have caused those new symptoms. The physical examination produced normal findings, except for reduced range of motion in the lumbar spine, decreased right big toe extension, and decreased ankle jerk reflexes. The physician's assistant interpreted an x-ray to reveal well-sealed graft and well-positioned hardware. She ordered an MRI. (Tr. 389-90).

On January 13, 2020, Barry complained to Dr. Coccia of neck pain, but he denied numbness and tingling in his upper extremities.  The examination of his cervical spine produced normal findings and on January 20, 2020, a cervical spine x-ray also produced normal findings.  (Tr. 334-36, 355).

On January 14, 2020, Barry continued to complain to Dr. Seymour of discomfort in his right buttock and tenderness in his lateral hip.  The physical examination produced normal findings, other than tenderness in the greater trochanter, reduced lumbar range of motion, and diminished ankle jerk reflexes.  Dr. Seymour reviewed the MRI results, which displayed previous changes at L4-5 had resolved, the spinal canal remained widely patent, the hardware remained intact, and the adjacent levels appeared well-maintained. (Tr. 322, 410).  Dr. Seymour administered an injection to Barry's hip, and it provided some relief.  Barry continued to complain of a "watery" sensation in both legs, but Dr. Seymour did not think he could perform any further decompressive procedures to address that complaint.  Dr. Seymour suggested removing the hardware from the lumbar spine and exploring the L4 nerve root could provide some additional relief, but Barry declined because he did not have time for that procedure, and the pain he experienced before surgery had greatly improved.  (Tr. 386-88).

However, Barry changed his mind, and on February 12, 2020, he underwent a lumbar laminectomy at L4-5 on the right and removal of non-segmental fixation on the right at L4-5.  (Tr. 362-72, 400-01).

During a February 21, 2020, follow-up appointment with Dr. Seymour, Barry

reported feeling "a little bit better" after taking oral steroids for right sided leg pain, though he still experienced some difficulty with ambulation.  He did not report using a walker.  Dr. Seymour prescribed more pain medication.  (Tr. 360-63, 384-85).

On March 10, 2020, Barry saw Dr. Coccia for attention disorder symptoms.  He reported recently undergoing surgery to remove hardware from his back, which required him to wear a back brace and prevented him from working.  He reported chronic lower back pain and radicular pain, with continued tingling in his limbs after the surgery.  The physical examination revealed tenderness on palpation of the lumbosacral spine, normal hip flexion, no thigh weakness, antalgic gait, and normal reflexes.  (Tr. 330-33).

On March 26, 2020, Barry reported to Dr. Seymour that he experienced continued pain down his right leg into his foot.  The lumbar spine examination remained unchanged.  X-rays displayed a solid fusion at L4-5 and removed hardware on the right side.  Dr. Seymour could not explain Barry's continued right side symptoms, so he ordered an MRI.  (Tr. 382-83).

On March 31, 2020, a lumbar spine MRI detected normal findings at L1-2; mild foraminal protrusion of the disks, facet joint arthropathy, and mild narrowing of the neural foramina at L2-3 and L3-4; left and right foraminal disc protrusions with associated spurring, mild narrowing of the bilateral neural foramina, and enhancing scar tissue at L4-5; and broad-based disc protrusion, facet joint arthropathy, mild canal narrowing, moderate narrowing of both neural foramina, both effacing L5 nerve roots

abutted within the foramina, and apparent right S1 nerve root abutted by the disc at L5-S1.  (Tr. 374, 408, 463).

During a visit to Dr. Seymour the same day, Barry continued to report leg symptoms, but "[h]e has otherwise been doing fairly well."  The spinal examination remained unchanged.  Dr. Seymour interpreted the most recent MRI results to portray decompression of L4-5 and no significant posterior encroachment on the right side, but some possible slight foraminal narrowing at L5-S1.  He assessed parasthesias in the right lower extremity.  Dr. Seymour did not believe the objective findings supported all of Barry's symptoms, and he prescribed Lyrica to treat the electric burning sensations Barry described.  (Tr. 380-81).

On April 21, 2020, Barry presented to Dr. Seymour for a three-month follow-up of the hardware removal procedure.  Lyrica helped his symptoms a little, but he still experienced some numbness and tingling.  The lumbar spine examination remained unchanged, and lumbar x-rays also indicated no changes.  Barry requested pain medication, but Dr. Seymour would not write an additional prescription, so he referred Barry to a pain clinic.  (Tr. 378-79).

On May 29, 2020, Barry reported to Dr. Coccia that he "wants to scream and yell" because of pain.  He had undergone multiple surgeries on his back, yet he still experienced pain.  He mentioned Dr. Seymour had referred him to a pain clinic, but he did not have an appointment until late June.  He went to the emergency room twice,

where he received medications that did not ease the pain.[2]  Dr. Coccia observed an antalgic gait, much tenderness in the area of the surgical scars, difficulty lying down and sitting up, and positive straight leg raising tests.  However, the examination findings also included no thigh weakness, the ability to stand on toes and heels, and normal reflexes.  Dr. Coccia prescribed a limited amount of pain medication through the date of Barry's pain clinic appointment.  (Tr. 325-27).

On June 18, 2020, Barry presented as a new patient at Valley Pain Clinic.  He reported back pain radiating to his right leg and foot, weakness in the right leg, and numbness across his lower back to the hip bone.  The pain started after his last surgery, and it had worsened since.  His pain level ranged from five to seven out of ten.  Lyrica and Celebrex had helped his symptoms in the past, but other medications and hip injections did not help.  The pain mildly limited his activities, as he cannot stand for more than a few minutes at a time, and walking, sitting, and lying down exacerbate the pain.

During the physical examination, Barry demonstrated slow, antalgic gait, and he used a cane.  He displayed tenderness upon palpation to the lumbar spine, normal lumbar range of motion, and positive straight leg raise and lumbar facet loading tests on the right.  Dr. Shikhtholth detected decreased pinprick sensation in the right leg, but normal patellar and ankle jerk reflexes.  He assessed chronic low back pain, lumbar

---

[2] The record does not contain any notes from these emergency room visits.

post-laminectomy syndrome, protrusion of intervertebral disc of lumbosacral region, and foraminal stenosis of the lumbosacral region. He prescribed Norco and Cymbalta, and he provided Barry with information on epidural steroid injections. (Tr. 453-57).

On July 2, 2020, Barry reported continued back pain radiating into his right leg and groin that had not diminished since the previous visit. He also reported numbness and weakness in the right leg. He ranked his pain on the day of the examination at level nine of ten, and it averaged a level eight. The pain moderately limited his daily activities, though the pain medication enabled him to get up and move around. He admitted never attempting physical therapy, but he used a cane and walker for ambulatory assistance. The clinical examination revealed slow, antalgic gait, with the assistance of a cane; no abnormality of the lumbar spine on outer inspection; and normal lumbar range of motion. Dr. Shikhtholth continued Barry's pain medications and recommended an epidural steroid injection. (Tr. 449-52).

On July 24, 2020, Dr. Shikhtholth administered a right L4-5 and L5-S1 transforaminal epidural steroid injection. (Tr. 448).

On July 27, 2020, Barry reported no improvement of pain or daily activities from the injection. To the contrary, he experienced increased pain and took extra pain medications, causing him to exhaust his prescribed supply. (Tr. 447).

On July 30, 2020, Barry continued to complain of radiating back pain that had increased since the last visit. The pain ranked at a level eight that day, consistent with his average daily level. The numbness in his leg had increased, and his condition caused

sleep disturbance and moderately limited his daily activities. He continued to receive no relief from the July 24, 2020, injection. During the physical examination, Barry displayed slow, antalgic gait, with the assistance of a cane, and normal lumbar range of motion. Dr. Shikhtholth continued Barry's medications and recommended physical therapy. (Tr. 443-46).

On August 28, 2020, Barry sought treatment from Dr. Chjeng Tao at Huntsville Hospital Spine and Neuro Center for low back pain, radiculopathy, weakness, numbness, and tingling in the right lower extremity. He experienced the pain constantly, and it had persisted for several months. He reported three previous back surgeries, and he felt relief from his latest surgery. He reported receiving Cymbalta and Lyrica, epidural injections, and a physical therapy referral from Dr. Shikhtholth, but he had not had the opportunity to pursue physical therapy. He had also seen a chiropractor for the pain.

The physical examination revealed normal posture, non-antalgic gait but usage of a cane, normal heel-to-toe walking, decreased spinal range of motion, full but painful range of motion in the bilateral upper and lower extremities, tenderness in the lumbar spine, no tenderness in the sacroiliac joint or greater trochanteric bursa, negative straight leg raise and pain with hip rotation, age-appropriate muscle bulk, slightly reduced muscle strength on the right side, normal pulses, and normal sensation. (Tr. 475-79).

During a September 16, 2020, return visit to Dr. Tao, Barry reported difficulty

walking, joint pain, muscle pain and cramps, cold extremities, joint stiffness and swelling, and muscle weakness. The physical examination revealed normal posture, non-antalgic gait but use of a cane, normal heel-to-toe walk, normal spinal and extremity range of motion, tenderness in the sacroiliac joint and right greater trochanteric bursa, negative Spurlings and straight leg raise tests, no pain with hip rotation, age-appropriate muscle bulk, and at least 4/5 muscle strength in all areas tested. Other than post-operative changes at L4-5, Dr. Tao did not see any obvious additional surgical pathology. He referred Barry to Dr. McCoomer for a trial of a spinal cord stimulator. (Tr. 471-74).

Barry saw Dr. McCoomer on February 9, 2021 (Tr. 481), but the record does not contain any records from that visit. On March 8, 2021, he reported a facet nerve injection provided 50% relief lasting three to four hours. However, his pain had increased during the past month with no known cause. He experienced lower back, hip, buttock, thigh, calf, and foot pain at a current level ten, with his pain level dipping no lower than level seven. His pain medications, which he supplemented with over-the-counter medications, provided minimal relief. A TENS unit provided some improvement. He owned a back brace, but he did not use it due to bulkiness.

The clinical examination revealed antalgic gait with a cane, impaired balance, normal coordination, and normal examination of the cervical spine and upper extremities. In the lumbar spine, Barry experienced tenderness on palpation, pain on range of motion, normal muscle bulk, abnormal lumbosacral strength, abnormal flexion

strength in the right hip, decreased response to tactile stimulation in the right leg and foot, positive compression test in the left sacroiliac joint, and positive sitting root test of the right leg, but negative sitting root test of the left leg. In the lower extremities, Barry demonstrated tenderness on palpation of the right and left greater trochanter and hip, abnormal hip range of motion, and normal knee, ankle, and foot range of motion. Dr. McCoomer scheduled Barry for a spinal cord stimulator trial, continued Barry's methadone prescription, and ordered physical therapy. (Tr. 480-87).

On March 22, 2021, Barry reported similar symptoms, but his pain ranked at a level six that day, though he stated his pain typically fell at a level seven or above. Dr. McCoomer installed the trial spinal cord stimulator. (Tr. 490-95).

On March 29, 2021, Barry reported the stimulator initially decreased his pain to a level one, but three days after the installation, he bent over in the yard, and the device disconnected, causing his pain to return to a level seven. However, due to his initial symptom relief, Barry desired to pursue a permanent stimulator implantation, and Dr. McCoomer referred him back to Dr. Tao for that procedure. (Tr. 496-502).

On April 5, 2021, Barry reported to Dr. Tao that the trial stimulator significantly improved his lower back and radiating right leg pain, but it exacerbated his mid back pain. Even so, Barry chose to proceed with permanent implantation of the stimulator. Dr. Tao observed that Barry demonstrated slightly stooped posture and antalgic gait with a cane. A thoracic spine MRI revealed some mild spondylosis, but Dr. Tao did not detect any pathology that would prevent placement of the stimulator. Therefore,

he scheduled the implantation procedure for two weeks thereafter. (Tr. 503-07). The record does not contain any further records regarding the implantation, but Barry testified during the April 22, 2021, administrative hearing that the implantation would occur the following week. (Tr. 56).

Barry asserts the ALJ selectively evaluated the medical record and failed to consider evidence consistent with his allegations, including "numerous physical examinations documenting abnormalities such as tenderness, spasms, positive straight leg raises, and slow, antalgic gait." (Doc. 12, at 15). But while the record reflects Barry consistently experienced radiating back pain and weakness, the ALJ acknowledged those conditions, and she assessed a residual functional capacity that included significant exertional and non-exertional limitations.

Specifically addressing the evidence Barry asserts the ALJ failed to consider, the court agrees the ALJ did not mention Barry's May 29, 2020, visit to Dr. Coccia, when he reported screaming and yelling because of pain, and he displayed antalgic gait, difficulty lying down and sitting up, and positive straight leg raise tests. (Tr. 325-27). However, there exists no requirement that the ALJ refer to each item of evidence independently. *See Brito v. Comm'r, Soc. Sec. Admin.*, 687 F. App'x 801, 804 (11th Cir. 2017) ("Although [the claimant] points to other evidence in the record that was consistent with her hearing testimony and to which the ALJ did not specifically refer in making her credibility determination, the ALJ was not required to examine or reference every piece of evidence, so long as it is evident, as it is here, that the ALJ considered

[her] medical condition as a whole."). Moreover, even if the ALJ had explicitly addressed Dr. Coccia's May 29, 2020, records, the findings from that single visit do not outweigh the remainder of the evidence, as discussed below.

The ALJ considered Dr. Shikhtholth's July 2020 examination findings, including antalgic gait and observed use of a cane, but those findings did not persuade her that Barry experienced more serious impairments. She noted Barry saw Dr. Shikhtholth only briefly, and Dr. Shikhtholth's findings conflicted with those of Dr. Seymour, who did not observe gait deficits or prescribe a cane. She also reasoned that Barry's reports of level seven to eight pain to Dr. Shikhtholth did not comport with examination findings of alertness and orientation, no acute distress, no abnormalities of the lumbar spine, and normal lumbar range of motion. (Tr. 30).

The ALJ discussed Dr. McCoomer's records, but she did not specifically mention Dr. McCoomer's clinical findings, including reports of tenderness. Rather, she focused upon Barry's reports of almost complete pain relief from the stimulator trial. (Tr. 31).

The ALJ also discussed Dr. Tao's April 4, 2021, records documenting slightly stooped posture and antalgic gait. But, considering other examination findings of normal heel-to-toe walking, normal spinal and lower extremity range of motion, negative straight leg raise tests, age-appropriate muscle bulk, 4/5 strength, and lack of sensory or reflex deficits in the lumbosacral spine, the ALJ nonetheless concluded "the longitudinal evidence" did not support "claimant having pain of the frequency, duration, or severity to limit him greater than" the RFC finding. (Tr. 31).

Contrary to Barry's assertion, the ALJ also discussed Barry's MRI results.  (Tr. 30).

Barry argues the ALJ selectively considered the medical records and "minimized the significance of the objective evidence in this case."  (Doc. 12, at 15).  But, other than the single record from Dr. Coccia discussed above, the ALJ evaluated all the evidence Barry mentions.  Barry interprets the evidence differently than the ALJ, as, in Barry's view, the evidence should support a finding of disability.  But, under the substantial evidence standard, the court cannot reweigh the evidence or second-guess the ALJ's conclusions.  *See Winschel*, 631 F.3d at 1178 ("'We may not decide the facts anew, reweigh the evidence, or substitute our judgment for that of the [Commissioner].'" (alteration in original) (citations omitted)).  As the substantial evidence discussed above supports the ALJ's residual functional capacity finding, Barry's contrary interpretation of the evidence does not warrant reversal.

The ALJ appropriately considered that months sometimes separated Barry's office visits, as he complained of back pain to Dr. Coccia on October 3, 2018, but he did not raise the issue again until he saw Dr. Seymour on July 16, 2019.  Barry also did not receive any treatment between September 26, 2019, and November 12, 2019, or between September 16, 2020, and February 9, 2021.

The record also supports the ALJ's conclusions that Barry never reported symptoms more significant than drowsiness from his medications, and no treatment provider ever prescribed an assistive device or placed permanent restrictions on Barry's

employment activities.

The ALJ also appropriately considered that Barry did not pursue physical therapy, though physicians prescribed it on multiple occasions. *See Ellison v. Barnhart*, 355 F.3d 1272, 1275 (11th Cir. 2003) ("We have held that 'refusal to follow prescribed medical treatment without a good reason will preclude a finding of disability.'" (citation omitted)).  And she properly considered that Barry applied for unemployment benefits, which required a representation that he could work and desired to work, as a claimant's inconsistent statements may inform the ALJ's assessment of the consistency of the claimant's allegations with the record evidence.  *See Coppins v. Saul*, No. CV4:19-188, 2021 WL 1606472, at *4 (S.D. Ga. Feb. 9, 2021), *report and recommendation adopted*, No. 4:19-CV-188, 2021 WL 1156628 (S.D. Ga. Mar. 26, 2021) (citing 20 C.F.R. § 404.1529(c)(4)) ("Inconsistent statements are explicit and adequate reasons for the ALJ to find claimant's testimony to lack credibility.").

Finally, the ALJ properly considered Barry's daily activities as inconsistent with his allegations of disabling pain.  The ALJ stated:

> In the evidence of record, the claimant reports abilities/activities that support finding him capable of the sedentary range of work in the above finding.  For example, in February 2020, after having had two corrective back surgeries, he reports being able to walk one-half mile "or more" at a time, he indicates unlimited use of his hands, and he can stand, bend at the waist, do posturals, and sit such as to wash dishes for 20-30 minutes daily, prepare complete meals daily, prepare lunch and snacks for his grandchildren, enter/exit a vehicle to routinely take his granddaughter to/from school, attend church services and have dinner with relatives, feed/water pets, sit in an office chair to read daily, use a computer to pay bills and shop, and independently bathe, dress, and groom . . . .  In

addition, the objective exams throughout Dr. Tao's records include the claimant with unremarkable use and exam of the upper extremities bilaterally, including no motor, sensory, reflex, or range of motion deficits, which is evidence that also supports the above sedentary range of work.

(Tr. 31-32).

Barry contends the ALJ did not acknowledge the limited nature of some of his activities, but the record supports the ALJ's findings. To the extent Barry would reach different conclusions than the ALJ about the significance of his limitations, the court reiterates it must not second-guess the ALJ's assessment, as substantial evidence supports it. *See Winschel*, 631 F.3d at 1178.

Barry asserts his "ability to do the reported activities does not provide substantial evidence to support the ALJ's determination that he can sustain a forty-hour work week." (Doc. 12, at 18). But while Barry's daily activities would not in and of themselves equate to the ability to perform full-time work, the ALJ did not consider these activities in a vacuum. Rather, when combined with the other evidence of record, the ALJ concluded the activities undermined Barry's subjective complaints. That determination found support both in applicable law and in the record evidence. *See Majkut v. Comm'r of Soc. Sec.*, 394 F. App'x 660, 663 (11th Cir. 2010) ("Although a claimant's admission that she participates in daily activities for short durations does not necessarily disqualify the claimant from disability . . ., that does not mean it is improper for the ALJ to consider a claimant's daily activities at all.") (citations omitted); 20 C.F.R. § 404.1529(c)(3)(i) (stating that an ALJ should consider a claimant's daily activities in

evaluating the limiting effects of his impairments).

In summary, the ALJ properly considered Barry's subjective complaints of pain and other symptoms, and substantial evidence supported her RFC finding.

## CONCLUSION

For the foregoing reasons, the court **AFFIRMS** the Commissioner's decision.  The court will enter a separate final judgment.

**DONE** this 29th day of September, 2022.

_____
HERMAN N. JOHNSON, JR.
UNITED STATES MAGISTRATE JUDGE